UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR-05-71-B-W |
| | ) | |
| | ) | |
| COSME SANCHEZ RAMIREZ, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In 1980, Cosme Sanchez Ramirez, then a teenager, was forced to leave Cuba for the United States at the point of a bayonet. A true stranger in a strange land, Mr. Ramirez has led an unfortunate and chaotic life in the United States. On April 13, 2005, by this time a felon, he found his way to Bangor, Maine, where he entered a pawn shop and tried to buy a High Point .380 pistol. Following indictment on federal gun charges, he proceeded to a bench trial, asserting an insanity defense. The Court concludes that the Government has proven each of the elements of each count beyond a reasonable doubt and that Mr. Ramirez has not sustained his burden of proof on the insanity defense. The Court finds him guilty as charged.

**I. STATEMENT OF FACTS**

On September 13, 2005, a federal grand jury indicted Mr. Ramirez,[1] alleging violations of 18 U.S.C. § 922(g)(1) (felon in possession), 18 U.S.C. § 922(a)(6) (false statements in connection with the acquisition of a firearm), and 18 U.S.C. § 911 (false

---

[1] The Defendant is variously referred to as "Sanchez Ramirez," "Sanchez," and "Ramirez." For purposes of brevity, the Court refers to him in this opinion as Mr. Ramirez.

representation of U.S. citizenship).  The parties presented evidence over a five day period in January 2007, filed subsequent memoranda, and made final arguments on June 11, 2007.

### A.  The Government's Case-in-Chief

#### 1.  Frati the Pawnbrokers

On April 13, 2005, Mr. Ramirez entered Frati the Pawnbrokers (Frati), a federally licensed firearms dealer, in Bangor, Maine, and expressed an interest in purchasing a gun. He completed ATF Form 4473 and returned the form to Mr. Frati; he also provided a Social Security card as identification, which Mr. Frati photocopied and retained with Form 4473.[2] While inside, Mr. Ramirez handled two guns: a Jimenez Arms 9 millimeter and a High Point .380 pistol.[3]  Of the two guns, Mr. Ramirez expressed a preference for the High Point .380 pistol because it was smaller.  Mr. Frati testified that Mr. Ramirez had made statements to the effect that guns "are supposed to be small so you can hide them in your clothes or put them in your pocket," so that "if a person walked near you or a police officer came in contact with you he wouldn't be aroused or think that you are armed in any way."  *Tr. II* at 30:9-11 (Docket # 185).[4]  Another patron in Frati's testified that he heard Mr. Ramirez say that he "wanted to be able to hide a weapon on him so that no one would know . . . [so that] he could

---

[2] The Social Security card includes a designation across the top which reads "Valid for Work Only with DHS Authorization."  Gov't Ex. 4.  On cross-examination, Mr. Frati stated that he did not particularly notice this designation nor did it alert him that there may have been an issue as to Mr. Ramirez's citizenship.

[3] On January 5, 2007, the Government presented the testimony of Brent McSweyn, a special agent with the Bureau of Alcohol, Tobacco, Firearms, & Explosives (ATF) who testified that the Highpoint and Jimenez firearms in this case were manufactured outside the state of Maine and were capable of firing a projectile.

[4] The defense later introduced the testimony of a private investigator who interviewed Mr. Frati in December 2005.  The investigator asked Mr. Frati whether Mr. Ramirez had made any statements about needing a gun that he could carry where the police could not find it; the investigator testified that Mr. Frati told him that he did not recall Mr. Ramirez making statements of that sort.

get the man before the man got him." *Tr. II* at 57:12-15.  Finally, a cabdriver testified that Mr. Ramirez told him he wanted to get a gun for protection.[5]

After Mr. Ramirez left the store, promising to return with proper photo identification, Mr. Frati submitted Form 4473 to the National Instant Check System (NICS).  Among other information, Mr. Ramirez wrote "No" in response to a question asking whether he had been convicted in any court of a felony;[6] he provided Miami, Florida as his place of birth, and he wrote that his country of citizenship was the United States.  During the phone call, NICS initially responded "delayed," but then denied approval.

On cross-examination, Mr. Frati acknowledged that when Mr. Ramirez first returned Form 4473, he had neglected to answer question 10, which asks "What is your country of citizenship?"  Gov't Ex. 3.  Mr. Frati pointed this out to Mr. Ramirez who inserted "Yes, USA." into the blank space.  In addition, Mr. Frati helped Mr. Ramirez to spell "Penobscot" County.  Other than that assistance, Mr. Frati testified that Mr. Ramirez completed the form entirely on his own.  Mr. Ramirez also marked that he was "American Indian or Alaska Native."  Gov't Ex. 3.

### 2.  The Bureau of Alcohol, Tobacco, Firearms & Explosives

Agent Erik Tall, of the ATF, obtained the original Form 4473 completed by Mr. Ramirez and the photocopy of the Social Security card.  Agent Tall completed an Interstate Identification Index check, which is a national database that keeps track of criminal convictions.  The check revealed that Mr. Ramirez was a felon.  Agent Tall then requested

---

[5] Both Mr. Frati and the cabdriver conversed with Mr. Ramirez without difficulty in English; the patron overheard Mr. Ramirez speaking in English.
[6] Mr. Frati explained that if someone "answered yes to the question if they were a felon, the transaction would stop. And I would tell them that they're not supposed to acquire or possess a firearm." *Tr. II* at 16:4-7.

and received certified documents that verified felony convictions.  Gov't Exs. 8-11.[7]  Agent Tall further testified that, when he went to arrest Mr. Ramirez at a motel, he asked him if he had a Social Security card and Mr. Ramirez denied having one.  Among the items collected from the nightstand in the motel room, however, was a Social Security card in the name of Cosme Sanchez Ramirez.

### 3.  Immigration and Customs Enforcement

Dwight Glidden, a deportation agent with the Immigration and Customs Enforcement (ICE) Office, also testified.  Agent Glidden stated that he is primarily responsible for monitoring the status of aliens in the United States, that is, individuals who, by definition, are not United States citizens or nationals.  The United States Citizenship and Immigration Services Bureau maintains an alien file for Mr. Ramirez.  The file reveals that Mr. Ramirez was born in Havana, Cuba in 1963, and that he first arrived in the United States in 1980.  The file reflects that he applied for asylum and after his application was denied, he was ordered excluded and deported back to Cuba.  Cuba, however, has refused to accept persons who arrived in the United States from the Mariel Boatlift in 1980, and Mr. Ramirez's deportation order was never executed.  Mr. Ramirez has never been a United States citizen.

Mr. Ramirez's alien file contains evidence that Mr. Ramirez knew that he was a citizen of Cuba.  On January 28, 2005, Mr. Ramirez documented his citizenship as "Cuba" on a federal form.[8]  Gov't Ex. 17-A.  On March 2, 2005, on his application for employment

---

[7] The Government exhibits reveal that Mr. Ramirez had been convicted of six felonies: burglary of a structure (Gov't Ex. 8), burglary of a conveyance (Gov't Ex. 8), burglary of a structure (Gov't Ex. 9), burglary of a structure (Gov't Ex. 10), obstruction of officers (Gov't Ex. 11), and terroristic threats (Gov't Ex. 11).  The Government also produced the expert testimony of a fingerprint analyst who compared the fingerprints on each of the judgments and convictions with those of Mr. Ramirez taken when he was arrested on the current charges.  He testified that all of the sets of prints are from the same person.  In any event, on cross examination, Mr. Ramirez acknowledged that he had some of these felony convictions.

[8] The form is an ICE form, Request for Release from Detention, in which Mr. Ramirez asked to be released from detention and stated that he planned to move to Portland, Maine if released.  Gov't Ex. 17-A.

authorization, Mr. Ramirez again listed Cuba as his country of citizenship. Gov't Ex. 17-C. When Agent Glidden met Mr. Ramirez in March 2005, he instructed him to carry his alien registration card with him at all times. The alien registration card further confirms that Mr. Ramirez is a citizen of Cuba.[9]

### B. The Defense

#### 1. Mental Health Problems Prior to Leaving Cuba

Mr. Ramirez testified that he was first hospitalized when he was thirteen years old. According to him, two or three weeks after being hospitalized, he escaped during outdoor recreational time. Mr. Ramirez stated that when he was placed in the hospital, a judge ordered a mental health evaluation. *Tr. II* at 116: 10-14.

Mr. Ramirez recounted two instances in which he had tried to hurt himself while still in Cuba. When he was seven years old, he took a bullet cartridge and stuck it in his foot with a hammer to escape teasing at school for not wearing shoes. *Tr. II* at 116:21-25. When he was either eight or nine, he threw himself from a second floor "[b]ecause I was disturbed. I was bothered. I was upset. I was losing control of myself. I was losing control of my mind . . . . [I] [d]idn't have control of myself, my person. I didn't know what I was doing." *Tr. II* at 117:13-20. He testified that the thought – to throw himself off of the roof – just suddenly came into his mind. Mr. Ramirez explained that there "are times when I think . . . I'm able to hear people speaking to me from another world. There are times when I think I can hear them. And I believe that I have the power to do what they tell me to do." *Tr. II* at 118:18-22.

---

[9] Mr. Ramirez admitted, during cross-examination, that he had his parole card (Gov't Ex. 14) as well as his employment authorization card (Gov't Ex. 15), which is a photo ID, with him in Bangor. His employment authorization card reads: "Department of Justice Immigration and Naturalization Service." Gov't Ex. 15.

Mr. Ramirez was part of the Mariel Boat Lift from Cuba in 1980.  When asked whether he knew why he was forced to leave Cuba, he replied:

> Because in Cuba, I will tell you the truth, Fidel Castro doesn't want anyone who has mental problems, doesn't want anyone who has no education, doesn't want criminals, doesn't want homosexuals, doesn't want lesbians. Castro wants a perfect place. That's why they threw me out of Cuba and had me come here.

*Tr. II* at 114:14-19.

### 2.  Mental Health Problems Since Coming to the United States

Mr. Ramirez recounted various instances in which he had tried to hurt himself after he arrived in the United States and then received mental health treatment.

In 1984, Mr. Ramirez was sent to a hospital in California for cutting himself on the wrist.  At some point in 1993, in New York, Mr. Ramirez began feeling like dead people were coming after him and following him everywhere.  As recounted by Mr. Ramirez, he first went to a government building in Manhattan to seek help or deportation to Cuba, but then went running down into the subway.  The police caught him in the subway and brought him to Bellevue Hospital.  He was transferred to a hospital in Brookline, due to a shortage of beds, and recalls remaining at the second hospital around five or six weeks.  In 1999, Mr. Ramirez was hospitalized in North Carolina, after he tried to "jump over the turnpike."[10]  *Tr. II* at 137:25; 138:1-5.

Mr. Ramirez also spoke about two incidents in Virginia in 2000, one in which he threw himself in front of a car and the other in which he laid down on the road waiting for a car to drive over him.  On the first occasion, after the police arrived, they took him to the hospital, where he maintained he stayed for approximately three weeks.  Sometime between

---

[10] Mr. Ramirez explained that he "was trying to jump over across the highway and cars were passing by and I was trying to kind of jump around, weave in around."  *Tr. II* at 138:3-6.

2001 and 2002, in Atlanta, Georgia, he heard voices "telling me to lie down on the train tracks, and it was better to die than continue to live . . . ." *Tr. II* at 130:24-25. Mr. Ramirez stated that he was hospitalized in Atlanta for three days following this incident. Mr. Ramirez said that on another occasion in Georgia, "I grabbed the – the bottle of pills and I tried to – I took them all with a bottle of alcohol – liquor to kill myself." *Tr. II* at 132:2-16.

### 3. Mental Health Problems in Maine

Mr. Ramirez was staying with a friend in Portland, Maine for about forty days before coming to Bangor. He testified that, during that period, he did not feel well, was suffering from depression, and "had a lot of hallucinations and [] felt that they were pursuing me and that they were following me everywhere." *Tr. II* at 126:10-13. "They" he said was "people from another planet or the government, people." *Tr. II* at 126:14-15.

At some point while he was living in Portland, the police took him to the hospital. As recounted by Mr. Ramirez, the police had responded to a report by his friend's nephew that Mr. Ramirez had grabbed a knife to kill himself. He recalled grabbing the knife but could not say what he intended to do with it because he "had taken alcohol" and "smoked a lot of marijuana" and his "brain wasn't working well at the time like it is now." *Tr. II* at 127:6-9. When asked to elaborate on his condition at the time, Mr. Ramirez stated:

> I felt that I couldn't go out in the street. I couldn't go outside. I felt really awful when I was out in the street and there were a lot of voices in my head. And there were a lot of voices that were telling – saying a lot of things to me, and they were telling me to go to Atlanta because I have doctors in Atlanta.

*Tr. II* at 127:12-18. Although Mr. Ramirez initially stated that, since being in the U.S., he had not heard voices before this incident, he went on to chronicle the history provided above, including the episode where he heard voices in Atlanta.

The police took Mr. Ramirez to the hospital a second time sometime between March and April 2005, while he was staying at the Broadway Crossing Shelter. He stated: "I was going to cook. They said that I was trying to light a fire in the kitchen, that I didn't know that I couldn't cook. I was crazy." *Tr. II* at 129:12-15. As a result, the police took Mr. Ramirez to Maine Medical Center, where he was held for a few hours and released.

Ultimately, Mr. Ramirez ended up in Bangor. He testified that he was actually planning on traveling by bus from Portland to Atlanta, to visit with his doctor there and receive medication. When he arrived at the bus station, he met a man and a woman. Mr. Ramirez said that he had been drinking prior to his arrival at the bus station and, upon meeting the couple, the three began taking pills and drinking liquor together. According to Mr. Ramirez, the couple told him that he should not go to Atlanta, that they had a house where he could stay, and that they were going to solve his medication problems by connecting him with places that provide medication and help. When they arrived in Bangor later that evening, however, the couple tried to steal his money. When he prevented them from doing so, they left him on the street near the Ramada Inn.

At approximately six a.m., because he was not feeling well, Mr. Ramirez took a cab to Eastern Maine Medical Center and presented at the emergency room. The emergency room staff refused care after smelling liquor on his breath. He asked the cabdriver to take him somewhere with a lot of people, in the hope that someone might speak Spanish; the cabdriver took him to a grocery store. Mr. Ramirez testified that, at this point, his mental state was "[p]retty bad." *Tr. II* at 150:7. He recollected:

> I had like a panic attack. It felt like a panic attack. And then I got over that and then I started to feeling very depressed and then I started to hear the voices. . . . I was – had started to hear the voices and they got worse when I was got to [the grocery

> store]. . . . The same thing was happening, the voices were – were in my head again, and I was – I started feeling that I was losing control over myself. And I was starting to feel that something was going to happen to me.

*Tr. II* at 150:9-25.  After being asked to leave the grocery store:

> I called a taxi. And the voices in my head said I should kill myself. So why would I want to keep living in a world like this, that no matter where you go they treat you like a dog. And so that's how it happened that I went to Frati's to see if I could buy a firearm to see if I could end the – end the life that I had been living, the years that I have.

*Tr. II* at 151:15-22.

Mr. Ramirez asked the cabdriver to bring him somewhere that sells firearms.  He stated that he told the cabdriver that he wanted the gun to defend himself, because "I can't tell everybody about my problems, everybody in the street . . . .You're not going to tell them that you're going to kill yourself.  Nobody says that to anybody."  *Tr. II* at 152:12-19.  Mr. Ramirez further stated that he lied to the cabdriver about his reasons for wanting a gun because if he had told him the truth, "then they're going to call the police and they'll – they'll arrest you."  *Tr. II* at 152:21-22.

### 4.  Hearing Voices

Mr. Ramirez explained that "[t]here are times when [the voices] are all together in my head.  Sometimes it's hard to tell what they're saying . . . And sometimes I hear music in my head also, as though it were a radio.  And I have this music in my head and I can't turn it off . . . ."  *Tr. III* at 21:2-7 (Docket # 186).  He was unsure of who the voices were, but suggested that they may be the voices of people who have died.  The voices spoke both Spanish and English.

Mr. Ramirez testified that he does not typically tell others that he hears voices.  He has felt it futile to share this information with mental health professionals since they were not going to help him.  At the time of trial, in January 2007, Mr. Ramirez had not heard voices for some period of time.  He posited that this may be "because of the medicine they're giving me. . . . Since I'm talking (sic) medicine, I don't hear the voices anymore."  *Tr. II* at 141:13-20.  Mr. Ramirez stated that he also feels generally better now and agreed that he feels better than he did in April 2005.

Even in his present state, however, Mr. Ramirez was unsure whether he would be able to resist voices urging him to do something.  He explained that "it's not a thing you can take out of your head to feel some peace," and that he has "tried enough [to resist the voices] and I wasn't able to."  *Tr. II* at 163:23-24, 164:5.  He stated later, on cross-examination, that singing, or speaking with someone who wants to help him, helps keep the voices away.

### 5.  Family History of Mental Health Issues

Mr. Ramirez testified that both his older brother and deceased mother had mental health issues.  He elaborated, saying that sometimes when he went to his mother's house, she would "get really nervous and be shaking.  She would have nerve problems.  And so I couldn't do anything for her, and I would take her to the hospital."  *Tr. II* at 143:14-16.  He stated that he learned about his older brother's mental health problems because "he was in the hospital while I was in Cuba and after I came here from Cuba, he was in the hospital."  *Tr. II* at 144:10-12.

### 6.  Alcohol and Drug Use

Mr. Ramirez stated that he has used marijuana, cocaine, pills and Valium.  Regarding alcohol, he could not recall how much he was typically consuming before being arrested.  He

only stated that there "are times when I will drink every day and there would be times when I

don't drink at all." *Tr. III* at 18:9-10.  He acknowledged, however, that he had been drinking

on April 13, 2005:

> I had some beer, and I had a six pack, and I don't really
> remember. But when the police arrested me, they found three
> empty cans of beer.  I drank three of them in a glass with ice,
> those last three.  I don't remember.  I could have drank – let me
> think.  Let me see if I remember.  I began drinking in Portland
> before coming up here to Bangor.  I had some hard liquor, beer
> also and pills.  Here I – I drank also.  I can't remember exactly
> how much it was.  It could have been a six pack.  It could have
> been two.

*Tr. III* at 18:25-25, 19:1-8.  Mr. Ramirez stated that when he consumes alcohol, "[s]ometimes

I think that I'm a different person, that I am not the same.  I'm someone else." *Tr. III* at

19:9-11.  Mr. Ramirez was unable to recall whether he told his doctor, Dr. Martinez, that he

has always known that "drinking gets [him] into trouble all the time," but he conceded that

he may have said that.  *Tr. III* at 20:15-18.

### 7.  Mr. Ramirez's Account of Frati the Pawnbrokers

Mr. Ramirez's memory of his interaction with Mr. Frati differs significantly from Mr.

Frati's recollection.  At one point, Mr. Ramirez stated that he was unable to remember certain

details of the exchange because "at that moment . . . my memory wasn't very good.  My

mind wasn't very good." *Tr. II* at 153:23-25.  Nevertheless, Mr. Ramirez testified that Mr.

Frati helped him fill out Form 4473, that he informed Mr. Frati he did not know how to read

or write well in English, and that Mr. Frati was showing him where to answer and "where I

had to put yes or no." *Tr. II* at 156:12.  Mr. Ramirez stated that Mr. Frati helped him with

almost all of the questions on the form.  Specifically, Mr. Ramirez stated that Mr. Frati:

> [S]tarted to read with his finger, then he – he pointed to where
> it says yes, no and he pointed for me  to – to write in the

> answer. . . . He told me where it says in the – in the – on the
> spot in the square to put yes, no, no, no.   Some of [the
> questions] I understood, but not all of them because I didn't
> even try to read the paper, what the paper said there.   I didn't
> know it was something like that because if I had, I wouldn't
> have done anything like that.

*Tr. II* at 157:15-25, 158:1-3.  The following exchange occurred between Mr. Ramirez and his

attorney:

> Q. Did you fill [Question 8] out?
> A. Yes, of course.
> Q. Did you know that you were marking the section that said
> American Indian or Alaskan Native?
> A. As I explained before, that kind of thing I didn't even read. I
> was just told and went boom, boom, boom and filled them out
> as told. That's the way it was done. I don't know if I was doing
> it well or not.
> Q. Are you an American Indian?
> A. I am Cuban.
> Q. So you're not an American Indian or Alaskan native?
> A. No, no.
>                                     ***
> Q. Were you attempting to fool Mr. Frati into thinking you
> were a Native American?
> A. No, no.

*Tr. II* at 160:20-25, 161:1-17; *see also* Gov't Ex. 3.  Similarly:

> Q. Have you ever been naturalized as a citizen in the United
> States?
> A. No.
> Q. You are citizen of Cuba?
> A. I was a citizen of Cuba. I don't know now if I am.  I'm still
> a citizen of Cuba because I'm not there.
> Q. What country are you a citizen of?
> A. Now I don't know what country is my country of
> citizenship. I don't know.

*Tr. II* at 122:21-25, 123:1-4.

At another point, Mr. Ramirez testified that he did not believe that he had a choice in

completing Form 4473:

> I was going along with the voices that I heard, ordering that I complete this or finish this, that I had to complete this and get – buy the weapon to kill myself.  I was serving – how can I say this?  I was following orders that I complete this in order to fulfill this order.  I wasn't acting with my mind clearly.  If I had been aware of what I was doing, I wouldn't be sitting here now talking about this.

*Tr. II* at 166:15-23.  Similarly, Mr. Ramirez maintained: "I didn't know what I was writing about, but if I knew what it had said, I . . . wouldn't have been filling it out.  I wouldn't have done such a thing like this.  I didn't know the importance of this paper.  I didn't know what it meant."  *Tr. II* at 165:6-11.  Still, he stated that his purpose in filling out Form 4473 was "to get a gun and kill myself.  That's what I was trying to do."  *Tr. II* at 167:22-23; he stated that his purpose in looking at the firearm was "to buy it, you know."  *Tr. II* at 168:14-15.

On cross-examination, the Government asked Mr. Ramirez how he knew to respond with answers that generally related to the question if he did not read the form.  For example, Mr. Ramirez wrote "Miami, FL" as his place of birth and "407 Cumberland Ave, Bangor, Penobscot, ME" as his address.  Gov't Ex. 3.  He was unable to say whether Mr. Frati had provided him with those answers.  The Government then introduced an attested copy of a judgment from June 2001, confirming Mr. Ramirez's conviction for giving a false name when arrested.[11]  Gov't Ex. 18.

### 8.  Dr. Angel Martinez: Direct Examination

The defense presented the expert testimony of clinical psychologist, Angel Martinez.[12]  Dr. Martinez is employed with the Department of Corrections in Florida, although he also maintains a small private practice.  At the Department of Corrections, Dr.

---

[11] The exhibit states that Mr. Ramirez told a police officer in Fort Walton Beach, Florida that his name was Jose Sanchez.  Gov't Ex. 18.
[12] The transcript incorrectly reflects that the doctor stated his first name was "Andrew," *Tr. III* at 78:5; this is inconsistent with other exhibits, which reflect that his first name is actually Angel.  Def. Exs. 1, 2, 3.

Martinez conducts parole evaluations, which address such concerns as whether an inmate would qualify as having a mental disease or defect that would preclude him from being paroled, whether those issues might endanger society, and whether ongoing substance abuse issues need to be addressed.

Dr. Martinez performed a comprehensive psychological evaluation of Mr. Ramirez. Def. Ex. 2, 3. In preparation for his evaluation, he conducted two interviews of Mr. Ramirez – one on February 6, 2006 and the second on February 10, 2006 – and reviewed his medical, psychiatric, police, prison, and immigration records. He also interviewed Dr. Corona, a Cumberland County jail psychiatrist, three Cumberland County corrections officers, Wanda Johnson, LCSW, Detective Tall, and Dr. Cosme Benitiz, a long-time friend of Mr. Ramirez.[13]   Def. Ex. 2.

Dr. Martinez produced a report dated February 15, 2006, in which he concluded:

> It is the opinion of this examiner, based on reasonable scientific certainty that the defendant was not suffering from an active phase of a severe mental illness or defect at the time of the alleged offense. Mr. [Ramirez] possessed the capacity to appreciate the wrongfulness of his behavior and conform his behavior to the requirement of the law. There is no evidence, in my opinion, that his offense was in any way a product of active mental illness or mental defect, which would not allow him to appreciate the nature and quality or wrongfulness of his acts.[14]

---

[13] Dr. Martinez's report lists Dr. Benitiz as "Cosme Benitiz, *M.D.*" Def. Ex. 2, 3 (emphasis supplied). The medical doctorate is likely an error, since the report elsewhere describes Dr. Benitiz as a veterinarian. In any event, Dr. Benitiz was Mr. Ramirez's sponsor when he first arrived in Miami. Def. Ex. 2 at 4, 14. Also, Dr. Martinez's report and testimony are confusing as to whether he actually interviewed Shawn Willson, M.D. The February 15, 2006 and August 29, 2006 reports initially reflect that he interviewed her twice – on February 3 and February 9, 2006 – however, unlike other interviews, the February 15, 2006 report does not contain a synopsis of the Willson interview. Instead, it echoes what is contained in Dr. Willson's October 6, 2005 report. Other than identifying Dr. Willson as an interviewee, the August 29, 2006 report does not contain any additional reference to her. Finally, in his testimony, when Dr. Martinez listed the persons he had interviewed, he did not mention Dr. Willson.

[14] A doctor "may not testify on whether [the defendant] could appreciate the nature and quality or wrongfulness of his acts . . . ." *United States v. Meader*, 914 F. Supp. 656, 659 (D. Me. 1996); FED. R. EVID. 704(b). The Court discusses Dr. Martinez's conclusions only as an example of the notable differences between his two reports. *See discussion infra* I.B.9, II.C.

14

Def. Ex. 2 at 28.   However, Dr. Martinez produced a second, markedly different report on August 29, 2006, in which he stated that Mr. Ramirez's presentation was consistent with that of individuals diagnosed with "Alcohol-Induced Psychotic Disorder with Hallucinations." Def. Ex. 3 at 12.   He concluded that "it is possible that he might not have understood the wrongfulness of his actions due to an alcohol-related psychosis."   *Id.* at 13.   Finally, he opined that Mr. Ramirez's mental disease or defect is "clearly" severe.   *Id.*

Dr. Martinez explained that between February and August, he received a few more medical records but, more importantly, he did some research on alcohol-induced psychosis. He stated that he was inclined toward alcohol-induced psychosis, in part, because some of the additional documents he received in December were from Dr. Corona, who maintained a diagnosis of alcohol-induced psychosis.   He testified that in re-reviewing Mr. Ramirez's records in further depth, he discovered a "pattern that [he] believed to be alcohol-induced psychosis."[15]  *Tr. III* at 95:5-6.   Specifically, Dr. Martinez said:

> [W]hat struck me was that there is a connection here between Mr. Sanchez-Ramirez's alcohol problems, which I think is alcohol dependence and underlying schizophrenic disorder, which I think is well-documented – I think that's well-documented given the – given the history, the psychiatric history, and the interaction of alcohol consumption with that underlying schizophrenic disorder.

*Tr. III* at 97:15-22.   Dr. Martinez stated that alcohol-induced psychosis is a dual diagnosis, meaning that an individual has two major issues, which interact.   According to Dr. Martinez, Mr. Ramirez has an issue with alcohol dependence as well as "a schizophrenic-type disorder."   *Tr. III* at 98:12-13.   As used in his report, "underlying schizophrenic traits" refers to the fact that:

---

[15] Dr. Martinez stated that alcohol-induced psychosis is a diagnosis that is accepted in his professional field and included in the DSM-IV.

> [Mr. Ramirez] has had 11 diagnoses of schizophrenia ranging
> from schizoaffective, which is one of the diagnoses that I gave
> him, to paranoid schizophrenia to disorganized schizophrenia.
> He's had bipolar disorder with psychotic features.  He's had
> delusional disorder.  He's had organic personality – he's had
> several diagnoses there, which make it kind of difficult to
> really pinpoint exactly, not having him over time in a
> controlled setting, what that schizophrenic picture looks
> like. . . . So it could be schizoaffective.  It could be certainly
> paranoid schizophrenia.  It could be disorganized . . . .

*Tr. IV* at 5:11-25, 6:1 (Docket # 187).  Ultimately, Dr. Martinez stated that various types of

schizophrenia are consistent with Mr. Ramirez's symptoms, which include "disorganized

thinking, a break with reality, a quick decompensation of cognitive function and mental

status changes . . . visual hallucinations . . . delusions . . . disruptive behaviors, disorganized

thinking, tangential, circumstantial, lucid ideas, flightive ideas and so on." *Tr. IV* at 6:11-17.

On direct examination, Dr. Martinez sought to clarify that "the primary diagnosis

here, in my professional opinion, is schizophrenia. The alcohol dependence, alcohol-induced

psychosis is a secondary diagnosis, which contributes heavily to the symptom manifestation

of hallucinations and some of the things that Mr. Cosme Ramirez indicated he experienced

resulting from consumption of alcohol."  *Tr. IV* at 4:23-25, 5-1-4.  Although he

acknowledged that "[a]nybody can have an alcohol-induced psychosis. . . . The diagnosis

becomes more powerful when you have a known alcohol dependence." *Tr. III* at 100:23-25.

Essentially, a diagnosis of alcohol-induced psychosis can be stronger or weaker, depending

on other criteria, such as "familial history as well as the environmental history." *Id.* at 101:9-

14.

In Dr. Martinez's professional opinion, Mr. Ramirez presents other criteria that render

the diagnosis of alcohol-induced psychosis more powerful, including "[t]he early history of

alcohol use, the alcohol dependence, the alcohol diagnoses, the treatment, his reporting again

to numerous hospitals with . . . mental status changes after consuming alcohol." *Tr. III* at 101:19-23.  Mr. Ramirez's alcoholism interacts with his schizophrenic traits in a way that "seems to be sort of the kindling in the fire. It seems to lower his threshold for the presentation of those [more] overt schizophrenic traits, particularly the – the auditory hallucinations, the visual hallucinations, disorganized thinking." *Tr. IV* at 6:22-25, 7:1.

According to Dr. Martinez, what "causes the psychosis is more the – the withdrawing from alcohol than actually being drunk, if you will. It is the constant back and forth of introducing the alcohol to the brain with withdrawal, with withdrawal." *Tr. III* at 99:1-5.  Dr. Martinez noted within his review those "occasions where [Mr. Ramirez] has not been drinking and he's hearing voices and seeing things . . . ." *Tr. III* at 102:1-3.  Specifically, he complained of hearing voices and seeing things, even in the controlled environments of the Cumberland County jail, the Bureau of Prisons, and group homes.[16]

Dr. Martinez suggested that some of the treatment, or lack thereof, of Mr. Ramirez may have focused too much on the alcohol as opposed to his possible underlying psychiatric disorder.  He believed that, in light of Mr. Ramirez's presentation, some of the hospital discharges without treatment were premature and explained that this was a common problem with individuals with a dual diagnosis.  He said: "It's very hard when you have a poor historian, homeless individual, who at times may be viewed as malingering to find a bed, who has alcohol dependence, schizophrenia, a poor historian and tends to malinger, I could completely understand where it's a diagnostic conundrum, absolutely." *Tr. IV* at 23:11-16.

---

[16] For example, on one occasion, while hospitalized in early March 2005, Mr. Ramirez reported confused thoughts about other planets and whether he had visited them before.  He believed that there was someone placing these thoughts into his head.

### a.  Malingering

Dr. Martinez testified that he did discover evidence of malingering when he examined Mr. Ramirez.[17]  *Tr. IV* at 26:12-15.  Dr. Martinez explained that there are tests to determine whether an individual is malingering and, based on these tests, he concluded that Mr. Ramirez was malingering.  *Tr. IV* at 29:9-11.  He stressed, however, that just because a person malingers does not mean that he or she does not have a psychological disorder.  *Tr. IV* at 30:17-19.  When asked whether Mr. Ramirez was trying to fake alcoholism, Dr. Martinez stated that he did not believe so, in part, because Mr. Ramirez denies having an alcohol problem:

> [T]here was a strong history of alcohol use and involvement. And I was always struck with the fact that Mr. Ramirez, and I think even to this day, denies having an alcohol problem, an alcohol-dependent problem, that struck me.  [He has a] long history. Again, going back from age seven, use of alcohol, the number – I don't have – have the figure on hand, but the number of times that he presented to hospitals with mental status changes with alcohol involvement. So that's – that's – that's something.

*Tr. III* at 86:24-25, 87:1-12.  Moreover, many reports and records suggest that he was incoherent on account of intoxication.  In any event, Dr. Martinez stated that Mr. Ramirez's malingering had no bearing on his conclusions, since they were based entirely on his re-review of Mr. Ramirez's records.

### b.  Medical Conclusion

Ultimately, when asked "it's your opinion, to a reasonable professional certainty, that Mr. [Ramirez] was suffering from [alcohol-induced psychosis with underlying schizophrenic traits] on April 13, 2005, the date of the incident in this matter?" he responded "I think that

---

[17] In Mr. Ramirez's context, Dr. Martinez defined "malingering" as exaggerating for a legal gain.  *Tr. IV* at 26:18-24.

was a possibility, yes sir." *Tr. IV* at 37:1-9.  He further testified that in Mr. Ramirez's mental disease or defect was severe.

### 9.  Dr. Martinez: Cross-Examination

On cross-examination, the Government probed the discrepancies between Dr. Martinez's first and second reports.

### a.  The February 15, 2006 Report

Dr. Martinez agreed on cross-examination that he knew that his initial evaluation was important, that is was important for him to be thorough and careful, that the report would bear on critical issues, and that those issues, in turn, would bear on Mr. Ramirez's guilt or innocence.  Dr. Martinez further acknowledged it was his understanding that the February report would be shared with the defense attorney, but not with the Government.  Yet, he issued his February 15, 2006 report, which reads:

> It is the opinion of this examiner, based on reasonable scientific certainty that the defendant was not suffering from an active phase of a severe mental illness or defect at time of the alleged offense.  Mr. Sanchez Ramirez possessed the capacity to appreciate the wrongfulness of his behavior and conform his behavior to the requirement of the law.  There is no evidence, in my opinion, that his offense was in any way a product of active mental illness or mental defect, which would not allow him to appreciate the nature and quality or wrongfulness of his acts.[18]

Def. Ex. 2 at 28.

Dr. Martinez's first report also contains considerable detail about Mr. Ramirez's malingering.  As he testified on direct examination, Dr. Martinez conducted a number of tests

---

[18] The Court allowed the Government to explore Dr. Martinez's opinion on the ultimate issue for impeachment purposes only.  The Government agreed that it was simply comparing the February and August reports to point out the contradiction.

to determine whether Mr. Ramirez was malingering.  His report, however, goes into considerably more detail:

> This [test] can be used to test the validity of a memory complaint.  The underlying principle is that the individual who consciously or unconsciously wishes to appear impaired will fail at a task that all but the most severely brain damaged or mentally retarded patients perform easily.  Mr. Sanchez-Ramirez's score on this measure suggest a clear attempt on his part to portray himself as experiencing memory impairments that do not actually exist.

*Id*. at 17.  The report goes on:

> Mr. Sanchez-Ramirez provides further evidence of a response style characterized by attempts to exaggerate and fabricate difficulties by his responses on three other tests which were administered to him in Spanish. . . . Mr. Sanchez-Ramirez's responses on the Structured Interview of Reported Symptoms provided considerable evidence that the defendant was motivated to exaggerate and/or fabricate psychotic-spectrum symptoms during the course of his interview with this writer. This was accomplished by his endorsement of rare symptoms (symptoms that occur very infrequently in bona fide patients) symptom combinations (psychiatric problems that rarely occur simultaneously), blatant symptoms (symptoms that untrained individuals are likely to identify as obvious signs of a major mental illness), selectivity of symptoms (indicates indiscriminant endorsement of psychiatric problems), and severity of symptoms (endorsing of blatant and subtle symptoms at an extreme or unbearable severity). . . . Perhaps the best evidence of an attempt on the defendant's part to appear more impaired than is actually the case came from the Structured Inventory of Malingered Symptomatology (SIMS) . . . Mr. Sanchez-Ramirez's SIMS profile indicates that he exaggerated and/or fabricated across each of the SIMS scales (Psychosis, Neurological Impairment, Amnestic Disorder, Low Intelligence, Affective Disorders). . . . [Finally] Mr. Sanchez Ramirez was administered the Personality Assessment Inventory (PAI). . . . His results suggested an element of exaggeration or complaints and problems.  In terms of percentiles, scores above the 70th percentile indicate feigning.  Mr. Sanchez-Ramirez's score was above the 95th percentile. . . . Thus, there is a reasonable degree of probability

> that the defendant is feigning or exaggerating his psychiatric
> symptoms.

*Id*. at 17-19.

In addition to his interviews and testing of Mr. Ramirez, Dr. Martinez's first report also includes a good deal of information from secondary interviews. For example, Dr. Martinez interviewed Corporal Pickreign, a corrections officer at the Cumberland County jail and the report includes Corporal Pickreign's statements that "I don't see any psychotic behaviors. He will act-out in that way when he does not get what he wants," and "[h]e speaks good English, but selectively. If he doesn't want to do something or is mad, he will pretend not to understand you or what you are asking him." *Id*. at 13.

Dr. Martinez also interviewed Mrs. Wanda Johnson, Mr. Ramirez's social worker who has been working with him since September 2005. Dr. Martinez's February report states that she remarked that Mr. Ramirez "is very manipulative – he wants to make a mental health case for his charges . . . ." *Id*. at 13. Mrs. Johnson reported that "she has not seen any psychotic behavior when she meets with Mr. [Ramirez]." *Id*. Finally, the report reads, the "police interviews indicate that all the witnesses at the time of the offense did not perceive Mr. [Ramirez]'s thinking or behavior as scrambled or disorganized." *Id*. at 28. It goes on:

> He did not behave as an individual out of touch with reality or out touch with his behavior. Mr. [Ramirez] had the forethought to falsely answer questions regarding his criminal status and citizenship, which, had he answered truthfully, would likely have precluded him from obtaining the firearm. He had the temporal cognition at the time, regardless of the situation or environment to understand the cause and effect of his actions. His behavior was goal directed, coherent and organized with the intention of possessing a firearm. Mr. [Ramirez]'s actions at the pawnshop and at the time of his arrest demonstrate that he had taken prior actions (telling the taxi to wait for him), understood that what he was doing was wrong (telling the pawnshop owner that he wanted a gun that

21

> could be concealed from the police, false statements on the
> ATF form, putting a firearm in his waistband and covering the
> firearm) and tried to avoid apprehension (did not produce the
> Social Security card when asked by the police). . . . His actions
> would indicate a significant degree of . . . planned, controlled
> behavior as well as an indication of ability to appreciate that
> his behavior was wrong.

*Id.*

### b.  The August 29, 2006 Report

Dr. Martinez's August report is strikingly different from the one he produced in February.  Along with his receipt of additional records pertaining to Mr. Ramirez, Dr. Martinez affirmed that he received an Order from this Court, discussing the definitions for insanity and competency and the legal thresholds.  Dr. Martinez further testified he understood the second report would be shared with the Government.  Nevertheless, unlike his February report, Dr. Martinez's August report omits all information he gathered from Mr. Ramirez during the interviews and testing, including his proclivity to malinger.[19]  Similarly, the August report omits the lengthy section of secondary interviews, including the multiple impressions that Mr. Ramirez is highly manipulative.

Dr. Martinez explained these omissions, saying that he considered the second review of Mr. Ramirez's case an entirely separate evaluation.  According to Dr. Martinez, these interviews were omitted because the August report was based exclusively on his re-review of the records with an eye towards a pattern consistent with alcohol-induced psychosis.[20]  As

---

[19] The Government pointed out on cross-examination that Dr. Martinez testified on direct that he "met with [Mr. Ramirez] for two full days.  I was there around seven or eight and left at six both times." *Tr. II* at 86:8-9.  Yet, Dr. Martinez's February report indicated that he met with Mr. Ramirez on February 6 for 1.33 hours and on February 10 for two hours.  Dr. Martinez explained that the remainder of the time he was administering tests so even though he only spoke with Mr. Ramirez for 3.33 hours, he was at the Cumberland County jail for two full days.

[20] Dr. Martinez admitted that he does not have much professional experience with alcohol-induced psychosis or with patients with that illness.  His second report includes full sentences from other articles without giving

such, he maintained that the information he gathered from these interpersonal exchanges was secondary and that the test results suggesting malingering had no bearing on his second evaluation.   Although Dr. Martinez repeatedly stressed that his second report was an evaluation based exclusively on his review of Mr. Ramirez's records, Dr. Martinez conceded on cross-examination that much of the second report still came directly from Mr. Ramirez, not from his records, including all or portions of the sections titled "Relevant History," "Medical History," "Substance Use," "Criminal History," and "Psychiatric History."   Def. Ex. 3.

In addition to the sizable contributions to the August report obtained directly from Mr. Ramirez, the Government further suggested to Dr. Martinez that the records on which he based his second evaluation were permeated with Mr. Ramirez's tendency to malinger, since the medical records were a reflection of his own presentation to the various health care providers.   For example, the Government introduced a report from Grady Health System in Atlanta, concerning the episode in which Mr. Ramirez claims to have thrown himself onto the subway tracks in a suicide attempt.   The record reads: "[Patient] says he's suicidal. Patient says this as he smiles and laughs.   Patient clearly manipulative, saying he needs a place to stay."   *Tr. IV* at 98:12-14; Gov't Ex. 24.   Dr. Martinez acknowledged that there were three or four references among the records where other treatment providers believed Mr. Ramirez was malingering his symptoms; he said: "The point's well-taken that there have been plenty, plenty of mental health providers who have questioned the veracity of the presentation."   *Tr. IV* at 72:17-20.

---

attribution to that article or mentioning the article in the sources of information.   Dr. Martinez explained that "the phraseology was better than what I could produce."   *Tr. IV* at 94:22-23.

### c. Medical Conclusion

Ultimately, Dr. Martinez conceded that he did not actually reach a diagnosis in his August report. Rather, he concluded: "given[] Mr. [Ramirez]'s description of the circumstances (heavy drinking, hearing voices, feeling depressed and suicidal), which let (sic) him wanting to purchase a gun to kill himself it is possible that he might not have understood the wrongfulness of his actions due to an alcohol-related psychosis." Def. Ex. 3. Dr. Martinez agreed that he does not have an opinion as to whether Mr. Ramirez actually suffered from a severe mental disease or defect at the time of the offense, saying "I put the question there of possibility, could be. . . . And his behavior could be explained as . . . alcohol-induced psychosis on top of a schizophrenic disorder." *Tr. IV* at 91:19-20, 22-24.

Moreover, Dr. Martinez conceded that a diagnosis of alcohol-induced psychosis or schizophrenia or of schizophrenic traits or of schizoaffective disorder would not necessarily mean that a person is unable to appreciate the nature and quality or wrongfulness of his acts. He further agreed with the statements that "in most situations the clinical diagnosis of a DSM IV mental disorder is not sufficient to establish the existence for legal purposes of a mental disorder, mental disability, mental disease, or mental defect," and "the fact that an individual's presentation meets the criteria for a DSM IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with that disorder." *Tr. IV* at 105:10-22.

### 10. Dr. Martinez: Re-Direct Examination

Dr. Martinez acknowledged that he had changed his mind after the initial report, but insisted that to do so was "not a bad thing." *Tr. IV* at 116:10-12. He explained that a psychologist "can always go back and . . . look at things that you might have missed and look

at other information . . . [in a] different light." *Tr. IV* at 116:13-16.  He also agreed that simply because hospitalization records have evidence of malingering does not render them "totally unreliable." *Tr. IV* at 116:20-25; 117:1-3.  Ultimately, when asked: "At the time of the alleged offense, could Mr. [Ramirez] been suffering from a mental disease or defect that was severe?" Dr. Martinez responded: "He could have."  *Tr. IV* at 118:17-20.  When pressed whether it was "more likely than not" that Mr. Ramirez was suffering from a "mental disease or defect that was severe," Dr. Martinez opined that he was.  He described the condition as schizophrenia.  *Tr. IV* at 118:21-25.

### C.  The Government's Response: Dr. Christine Scronce

In response, the Government presented the expert testimony of Dr. Christine Scronce, a clinical psychologist at the Federal Medical Center in Devens, Massachusetts.  Like Dr. Martinez, Dr. Scronce is a forensic psychologist; Dr. Scronce primarily does evaluations for the court on issues of competency, sanity and dangerousness.[21]  *Tr. IV* at 124:19-21.  As part of her responsibilities at Devens, she is charged with evaluating a defendant's competency and mental condition at the time of an alleged offense.  She explained that the inquiry is "whether or not this person has a mental illness or some sort of mental abnormality, but also specifically whether they had those symptoms at this particular time that the crime occurred." *Tr. IV* at 129:4-9.  If the conclusion is that the person was suffering from a mental illness at the time of the incident, the doctor then explores "what were the symptoms and how severe were they, and did they impact the person's ability to understand what he was doing or the wrongfulness of his behavior, so there has to be a nexus there, as well."  *Tr. IV* at 129:12-17.

---

[21] Dr. Scronce contrasted the setting of her evaluation from other clinical settings.  *Tr. IV* at 127:12-25; 128:1-22.  Unlike a traditional clinician, she must make it clear to defendants that her "client" is the court, that there is no confidentiality, and that the report goes to the court.  In this setting, defendants may not be motivated to tell the truth and she cannot rely exclusively on their self-reporting.  This is unlike the more typical setting, in which patients are seeking treatment and are presumably motivated to tell the truth.

For example, then, someone could have a mental disorder, but not be suffering from any symptoms at the time of the offense. *Tr. IV* at 129:21-25; 130:1-2.

Mr. Ramirez arrived at Devens on May 5, 2005, only a few weeks after the alleged offense. *Tr. IV* at 126:17-21. Dr. Scronce engaged in eight hours of interviews with him, conducted four hours of testing, and gathered observations from staff members. *Tr. IV* at 141:22-25; 142:1-7. She reviewed a number of Mr. Ramirez's records, including the medical records from Maine General.[22] *Tr. IV* at 134:18-25; 135:1-21. She elaborated that these were of particular significance because they present a snapshot of Mr. Ramirez's clinical status just prior to the alleged offense, *Tr. IV* at 136:10-18: the record reflects that he was admitted and shortly thereafter discharged with a diagnosis of alcohol abuse and antisocial personality disorder, but there was no mention in the medical record of any symptoms of mental illness. *Tr. IV* at 137:4-12.

Dr. Scronce also viewed the videotape taken from Frati's the Pawnbrokers. *Tr. IV* at 138:5-6. She stated: "When I reviewed the – the videotape later, I just noticed the things that I didn't see that I was expecting to see. I didn't see anything unusual in his demeanor or his dress. I didn't notice anything unusual about his gait or his dexterity." *Tr. IV* at 138:14-18. Finally, Dr. Scronce reviewed both of Dr. Martinez's reports. She described the February report as "comprehensive," and "well-formulated, well put together." *Tr. IV* at 160:1-6.

Based on her evaluation, Dr. Scronce concluded that Mr. Ramirez did not suffer from a severe mental disease or defect at the time of the incident. Dr. Scronce explained:

> [M]y assessment of his – of his presentation at Devens, I
> concluded that he was malingering. That doesn't rule out the
> possibility that someone may have a mental illness, as I noted
> in my report. However, it does make it more difficult to

---

[22] Dr. Scronce itemized those reports she received before her written evaluation and those she received following her evaluation.

determine what symptoms are real and what are false. And I found the same thing when I was going back over the records. When somebody has a long psychiatric history and they're malingering in your evaluation, it's – it can be difficult to tease-out what's what when you're looking at the – at the records. The easiest thing to do sometimes is to just, say, give them a catch-all diagnosis, like psychotic disorder not otherwise specified. I do that a lot because sometimes it's so difficult to tease-out the etiology and somebody could be using substances, somebody could be – have a real mental illness, somebody could have medical problems. And when you're trying to look through this mountain of information, it's so difficult to sort through. So one thing that I really considered in this case was to give a diagnosis like that, psychotic disorder not otherwise specified, but when I started looking at the records carefully, even though he had gotten these diagnoses in the past, I was just not finding a lot of support for – for the diagnosis. So it wasn't really described, you know, what exactly were the symptoms that he was demonstrating at that time. . . . I also was aware when I talked to him about his history. He spontaneously reported to me, a lot of people think I'm faking. A lot of people think that I just go to the hospital to get shelter, and that's not true. I thought that was unusual because I hadn't, you know, expressed any, you know, suspicion of him at that point. It was funny that he would just spontaneously say that. And when I reviewed the records, I saw a lot of that. I saw a lot of his contacts with the mental health services that had to do with trying to get shelter. . . . This was the pattern that I saw in the records. And so while I really considered just giving this sort of catch-all diagnosis . . . I started to realize, I don't – I didn't think that he had any kind of mental illness at all. I think that he was – as I said in my report, using the mental health system to try to get his basic needs met. And that was a pretty strong statement that I made and I didn't make that lightly, but I just felt that in good conscience I could not say that I felt that I thought he had a mental illness.

*Tr. IV* at 144:16-25, 145:1-19, 146:5-25, 147:1-8.

Dr. Scronce thought that Mr. Ramirez was malingering and found "many examples of . . . manipulative behavior." *Tr. IV* at 154:9-10. She testified that Mr. Ramirez was acutely interested in what her report would say. He "repeatedly questioned me about what I was

going to say in the report.  And he suggested different interpretations of the data for me."  *Tr. IV* at 153:10-13.  Mr. Ramirez told Dr. Scronce "that I should write in the report that he was incoherent, that he was intoxicated . . . ."  *Tr. IV* at 153:14-16.  He also "gave many other explanations about his offensive behavior that were all things that would reduce his culpability, for instance, blaming the pawn shop owner and saying that he couldn't read English and he didn't know what he was filing out.  So he had many different explanations for his behavior."  *Tr. IV* at 154:23-25, 155:1-3.  When Dr. Scronce refused to reveal the substance of her report to Mr. Ramirez, he went to other clinicians, asking them to share Dr. Scronce's impressions with him, telling them that she was too busy to tell him.

Another example she provided was:

> [O]ne evening he told the officer he was hearing voices and he wanted to talk to a clinician.  My colleague, Dr. Schols, who's another forensic psychologist, went to see him and assess the situation, and he said that he wanted to move back to a different unit where he had his own room.  And he said that he was taking all these medications and he was worried that the medications would prevent him from defending himself if he got into a fight or prevent him from going to the dining hall.  And what was described in the note and when I talked to my colleague was he was very insistent about this.  And eventually they did give him a different room on that unit, gave him a single room, that he was satisfied with that, but that was one example where using the symptom of, I'm hearing all these voices.  And there seemed to be a pretty clear motivation, external motivation for reporting that.

*Tr. IV* at 152:10-25, 153:1-2.

According to Dr. Scronce, Mr. Ramirez's acting out is further evidence of his manipulation:

> So take, for instance, the smearing of feces, which is an extreme behavior, obviously, and in Mr. [Ramirez]'s case, the – what's described in the records is when he doesn't get his needs met right away, when he has something that he wants

> and he doesn't get it, this is his way of dealing with that
> situation, you know, forcing the correctional staff to clean up
> the mess.  So as opposed to somebody that's just completely
> disorganized and isn't able to care for himself and doesn't
> know what he's doing.

*Tr. IV* at 150:23-25, 151:1-7.[23]  Finally, Dr. Scronce pointed out comments in one of the

Grady medical records:

> [I]n the discharge summary that describes him saying that he
> was going to tell his other homeless friends that they should
> report that they're suicidal or homicidal so they can come to
> the hospital because you get a bed and food and it's much
> better than being in jail.  So even then there was quite a bit of
> suspicion about the genuineness of his presentation.

*Tr. IV* at 159:1-8.  Notably, Dr. Scronce had not received this report when she made her

assessment of Mr. Ramirez, but testified that the report was consistent with her own

assessment.

Well after fashioning her conclusions, Dr. Scronce observed Mr. Ramirez testify

during trial.  She described "very obvious inconsistencies between the story he gave in his

testimony and what he told me.  The whole story about hearing voices to tell him to – telling

him to commit suicide, he had none of that kind of report when I interviewed him.  There

was nothing about that at all.  He told me that he just went there to browse and he, you know,

was – didn't really describe the reason why he went to the pawn shop."  *Tr. IV* at 139:13-21.

Dr. Scronce also noted Mr. Ramirez's persistent statements of his own veracity, saying:

"when I'm doing an assessment, that is a red flag when somebody repeatedly tells me, I'm

being honest with you.  I wouldn't lie to you."  *Tr. IV* at 140:13-15.  She explained that

---

[23] Dr. Scronce noted that, although the Government loosely labeled this sort of conduct as not "normal" in the typical sense, she "wouldn't describe it as unusual, particularly in our setting.  We see every – every example of conning and manipulation . . . ."  *Tr. IV* at 152:2-9.

people frequently are not telling the truth when they repeatedly give assurances that they are. *Tr. IV* at 140:3-18.

Moreover, Dr. Scronce stated that Mr. Ramirez's testimony of his experience with command auditory hallucinations – that they just overwhelmed him and that he could not resist their commands – is "an atypical description" of those symptoms; typically, people retain "some control of their behavior" and do not feel as though they must "blindly follow whatever they're told to do." *Tr. IV* at 140:19-25; 141:1-3. Similarly, Mr. Ramirez's testimony that the voices were constant is also "atypical;" usually, "voices are intermittent or people can do something to reduce the severity of the voices." *Tr. IV* at 141:4-11. Dr. Scronce stated that "when somebody tells me that the voices are just constant and they have to do whatever the voices say, those are just suspicious signs." *Tr. IV* at 141:9-11.

Notwithstanding suspicious behavior, however, Dr. Scronce stated that clinicians must frequently take patients at their word. *Tr. IV* at 148:1-2. She explained that many, if not most, clinicians simply do not have time to obtain records from other facilities or conduct an extended evaluation. For example, if a patient were to arrive and say that he is hearing voices telling him to kill himself, the clinician would have to act right then and "people that want to use the mental health care system for shelter know that. They know that, what they need to do to get themselves admitted to a hospital." *Tr. IV* at 148:6-9. Similarly, if a clinician, at some point, does make a diagnosis of unspecified schizophrenia, subsequent clinicians will continue with that presumptive diagnosis because they do not have any additional information or the time to perform a full evaluation. Dr. Scronce stated that, as a result, the fact that a person has been prescribed a particular medication does not mean that that person has a serious mental illness. *Tr. IV* at 149:2-9.

On cross-examination, defense counsel probed this final point. Dr. Scronce admitted that, given the serious side effects of antipsychotic medications, prescribing physicians should be very careful not to prescribe them unless they are necessary. Further, when Mr. Ramirez arrived at Devens he was on antipsychotic medication; over the course of his forty-five day evaluation at Devens, Mr. Ramirez remained on antipsychotic medication; and, Mr. Ramirez ultimately left Devens on the same antipsychotic medication. Again, however, Dr. Scronce explained:

> It's clinically appropriate when somebody comes in and say they have a history of psychosis and they says they have a history of having auditory hallucinations and they come in on an antipsychotic medication, it's understandable that someone would continue the medication, even if information is found later on to call that diagnosis into question. So they make the clinical decisions they have to make with the information they have available at the time.

*Tr. IV* at 172:21-25, 173:1-4. Moreover, Dr. Scronce did not produce her report, or share her findings with the prescribing clinicians, until after Mr. Ramirez had left Devens. Still, she stated:

> [P]eople have the perception that we can do experiments on people and just take them off medication to see what will happen. That's not what a psychiatrist would do. So even if they did have this information about the malingering and suspect that that was the case, they're probably not going to discontinue it right before someone leaves because they want to do some follow-up to make sure and to make sure that they're taken off the medication in the appropriate way. So that's – that's why when we have them for a short period, there's usually not many or any changes in the medication regimen, if they can help it.

*Tr. IV* at 174:19-25, 175:1-6.

Finally, Dr. Scronce acknowledged that, simply because a particular type of behavior is atypical for a particular psychological diagnosis, the presence of that behavior does not

rule out that diagnosis; that alcohol could increase the likelihood of experiencing auditory hallucinations in a person who has been diagnosed with schizophrenia and who tends to experience command auditory hallucinations; that alcohol could also increase the intensity of those hallucinations; that people sometimes do give in to auditory commands; that if a person suffered from alcohol-induced psychosis but then went through withdrawal after a period of not drinking, then perhaps the symptoms of that psychosis would not be outwardly evident; and, that Mr. Ramirez was not drinking while at Devens.

**D.  The June 11, 2007 Argument**

After the evidence closed, the parties submitted written argument and the Court further allowed counsel to present oral arguments, which were scheduled for June 11, 2007. When Mr. Ramirez arrived at the courthouse, he was beside himself. Prior to the arguments there was considerable banging in the holding cell near the courtroom and, at a conference of counsel, the United States Marshal expressed serious safety concerns, noting that Mr. Ramirez was virtually uncontrollable. As this was not a jury trial and no evidence was to be taken, the Court acceded to the Marshal's recommendation that he be shackled for the hearing. *See Moore v. Ponte*, 186 F.3d 26, 35 (1st Cir. 1999) (noting that physical restraints may be used to control unruly defendants in criminal trials, but only as a last resort); *United States v. Pina*, 844 F.2d 1, 8 (1st Cir. 1988) (concluding that in a jury trial context, brief exposure of the defendant in shackles to some of the jurors is not inherently prejudicial).

When the proceedings began, Mr. Ramirez engaged in a loud, continuous rant, a foul and abusive harangue against all present. After entering, the Court waited to see if Mr. Ramirez would calm down. He did not. In accordance with *Illinois v. Allen*, the Court asked Mr. Ramirez if he could behave himself and repeatedly warned him that it would have him

removed from the courtroom, if he persisted.  397 U.S. 337, 350 (1970) (holding that "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.").  Mr. Ramirez continued unabated with his incoherent and profane screed and showed no signs of controlling himself.[24]  As Mr. Ramirez was incapable of remaining in the courtroom without disrupting the proceedings, the Court ordered him removed and the parties made their final presentations in his absence.

## II. DISCUSSION

### A. Mental Health Evidence To Negate *Mens Rea*

Preliminarily, Mr. Ramirez has argued that psychological evidence – apart from the psychological evidence offered for the insanity defense – may be used to negate *mens rea*. He is correct.  As the First Circuit has noted, "in principle there should be no bar to medical evidence that a defendant, although not insane, lacked the requisite state of mind."  *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997).  However, there are significant limitations to the applicability of such evidence.  Even though the First Circuit has "not yet adopted the general/specific intent distinction under IDRA," *United States v. Santos-Bueno*, No. 04-40023-FDS, 2006 U.S. Dist. LEXIS 6275, at *15 (D. Mass. Jan. 5, 2006), it has said that "[t]o be admissible, such evidence must directly negate intent."  *United States v. Marenghi*, 893 F. Supp. 85, 90 (1st. Cir. 1995).  Thus, "mental conditions or defects would rarely, if ever, negate a general intent requirement, given that general intent demands only

---

[24] Mr. Ramirez's wild presentation on June 11, 2007 stood at stark contrast to his composed appearance during trial.  During the five days in January, 2007, Mr. Ramirez sat quietly and, when he testified, he was entirely appropriate.

proof of knowledge with respect to the *actus reus* of the crime." *Santos-Bueno*, 2006 U.S. Dist. LEXIS 6275, at *14-15 (internal punctuation and citations omitted).

As the Government maintains and the Defendant implicitly acknowledges, it appears that "the use of psychological or psychiatric evidence to negate an element of the government's case is limited to offenses requiring proof of a specific intent."[25]  *Gov't Post-Trial Br.* at 9 (Docket # 188) (*Gov't Br.*); *Def.'s Post-Trial Br.* at 2-3 (Docket # 191) (*Def.'s Br.*).  *See United States v. Brown*, 326 F.3d 1143, 1147 n.2 (10th Cir. 2003) ("The use of psychological or psychiatric evidence to negate an element of the government's case is limited to offenses requiring proof of a specific intent.); *United States v. Gonyea*, 140 F.3d 649, 650 (6th Cir. 1998) ("In the federal courts, diminished capacity may be used only to negate the mens rea of a specific intent crime."); *United States v. Cameron*, 907 F.2d 1051, 1063 n.20 (11th Cir. 1990) ("Psychological evidence is relevant to *mens rea* only when the defendant is charged with a specific intent crime."); *United States v. Pohlot*, 827 F.2d 889, 897 n.4 (3d Cir. 1987) ("Most states, however, limit psychiatric evidence to specific intent crimes on the theory that mental abnormality can virtually never disprove the mens rea required for general intent crimes so that psychiatric evidence would be misleading.").

Here, the Defendant seems to take the position that each crime is a specific intent crime; it is therefore necessary to analyze each count to determine whether the crime is a general intent crime to which such psychological evidence would be largely inapplicable, or a specific intent crime to which such evidence would be directly relevant.

---

[25] To be clear, even if the crime is a general intent crime, psychological evidence may be relevant.  Under the state of the law in this circuit, a defendant may present psychological evidence to counter the Government's case-in-chief on a general intent crime, assuming the evidence is probative as to *actus reus* of the crime.  Here, the Court has concluded that the Government has sustained its burden on the general and specific intent counts, despite the psychological evidence.

### 1.  Count One: Violation of 18 U.S.C. § 922(g)(1) – Felon in Possession

Mr. Ramirez argues that possession of a firearm by a felon is a specific intent crime and, therefore, psychological evidence is relevant as to whether the Government proved the required degree of *mens rea*:

> Because the government must prove that a § 922(g) defendant intentionally possessed a firearm, Count I alleges a specific intent crime.  The "knowingly" standard, along with its "intentionally" component, constitutes an element of the Count I offense.  Therefore, the government must prove beyond a reasonable doubt . . . that Mr. Sanchez-Ramirez "intentionally" possessed a firearm.

*Def.'s Br.* at 2-3.   Mr. Ramirez is simply incorrect.

Although the First Circuit has not explicitly held that a violation of 18 U.S.C. § 922(g) is a general as opposed to specific intent crime, it has all but said so:

> The federal felon-in-possession statute requires proof that the defendant *knowingly* possessed a firearm.   Beyond that, however, 18 U.S.C. § 922(g) is a strict liability statute, which contains no specific mens rea element at all.   Literally, the felon-in-possession statute encompasses both the felon who intentionally arms himself to rob a bank and the felon who frustrates the robbery by snatching the gun out of the robber's hand.

*United States v. Leahy*, 473 F.3d 401, 408 (1st Cir. 2007) (citations omitted; emphasis in original).[26]  Here, such evidence does not negate the knowledge requirements of 18 U.S.C. § 922(g).

---

[26] The circuits that have expressly addressed the issue uniformly hold that § 922(g) is a general intent crime. *See United States v. Archambeau*, 179 Fed. Appx. 403, 405 (8th Cir. 2006) (stating that unlawful possession of a firearm as a previously convicted felon is a general intent crime); *United States v. Carlisle*, 173 Fed. Appx. 796, 800 (11th Cir. 2006) ("The crime of being a felon in possession of a firearm does not require any specific intent."); *United States v. Ledford*, 443 F.3d 702, 716 (10th Cir. 2005) (stating that 'Congress may criminalize knowing acts committed without specific intent" and "Congress' use of [the] term 'knowingly' [has previously] indicated a general intent offense."); *United States v. Dodd*, 225 F.3d 340, 347 n.4 (3d Cir. 2000) ("The case law in our court describes the § 922(g) offense as a 'general intent' crime . . . ."); *United States v. Lane*, 267 F.3d 715, 720 (7th Cir. 2001) ("18 U.S.C. § 924(a)(2) incorporates a general intent requirement, namely that a defendant must have known that the object he possessed was a gun."); *United States v. Willis*, No. 97-4091,

### 2. Count Two:  Violation of 18 U.S.C. § 922(a)(6) – False Statement

While Defendant's post-trial brief is not explicit, his previous filings have argued that a violation of 18 U.S.C. § 922(a)(6) is a specific intent crime.  *Def.'s Mot. to Reconsider Order on Gov't Mot. in Limine* at 3 (Docket # 102) ("Counts 2 and 3 of the Indictment are specific intent crimes, meaning that the government must prove beyond a reasonable doubt that Mr. [Ramirez] 'knowingly made a false statement' . . . .").  However, as the Government states in its post-trial brief, the cases consistently hold that a violation of § 922(a)(6) is a general intent crime.  *See, e.g., United States v. Harrelson*, 705 F.2d 733, 736 (5th Cir. 1983) ("Specific intent is not an essential element of a § 922(a)(6) offense; the government need only prove that the defendant imparted 'false information, with the general intention of deceiving or likely to deceive' the dealer."); *United States v. Elias*, 937 F.2d 1514, 1518 (10th Cir. 1991) ("specific intent to deceive a dealer is not required.").  To the extent Defendant is raising the argument now, the Court cannot conclude that a violation of § 922(a)(6) is a specific intent crime.  The psychological evidence here does not negate the requisite level of intent.

### 3. Count Three:  18 U.S.C. § 911 – False Impersonation

Unlike Counts I and II, Count III is a specific intent crime.  The Government concedes as much:  "The 'willful' element of 18 U.S.C. § 911, on the other hand, seems to make that crime a specific intent crime.  *See United States v. Bailey*, 405 F.3d 102, 111 n.4 (1st Cir. 2005); *United States v. Pitrone*, 115 F.3d [1, 6 (1st Cir. 1997)]."  *Gov't Br.* at 10.  Discussing the difference between "knowingly" and "willfully," the First Circuit in *Pitrone*

---

1999 U.S. App. LEXIS 18298, at *12 (6th Cir. July 29, 1999) ("[T]his Circuit has specifically recognized that a violation of § 922(g) is a general intent crime."); *United States v. Kegley*, No. 90-30261, 1991 U.S. App. LEXIS 4714, at *6 (9th Cir. Mar. 18, 1991) ("Violation of § 922(g) is a general intent crime, requiring only that the defendant act knowingly.").

36

noted that "willfully" traditionally accompanies specific intent crimes.  *Pitrone*, 115 F.3d at 6.  Moreover, the Supreme Court has stated that "when used in the criminal context, a willful act is one undertaken with a bad purpose.  In other words, in order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  *Bryan v. United States*, 524 U.S. 184, 191-92 (1988) (citation and punctuation omitted).  Thus, the Court will consider psychological evidence in evaluating whether the Government has sustained its burden of proof, mindful however that law does not allow this type of evidence to "reintroduce the very concepts that Congress wanted to exclude . . . [when it] raised the hurdle for an insanity defense and barred a new diminished capacity defense that courts were beginning to invent."  *Schneider*, 111 F.3d at 203.

### B.  The Government's Case

It is axiomatic that the Government must prove each and every element of the offenses charged beyond a reasonable doubt.  *United States v. Cleveland*, 106 F.3d 1056, 1062-63 (1st Cir. 1997).

### 1.  Count One: Violation of 18 U.S.C. § 922(g)(1) – Felon In Possession

To demonstrate a violation of 18 U.S.C. § 922(g)(1), felon in possession, the Government must prove: (1) that Mr. Ramirez has been convicted in any court of at least one crime punishable by imprisonment for a term exceeding one year; (2) that Mr. Ramirez knowingly possessed the firearm; and (3) that the firearm was connected with interstate commerce. *Judge Hornby's 2007 Revisions to the Pattern Criminal Jury Instructions for the District Courts of the First Circuit* § 4.18.922(g) (Jury Instructions).  The jury instructions further provide that the "word 'knowingly' means that the act was done voluntarily and

intentionally, not because of mistake or accident." *Id*. Knowledge that the defendant is violating the law is not an element of the crime; the Government need only prove beyond a reasonable doubt that the defendant knew that the instrument possessed was a firearm. *United States v. Ramos*, 961 F.2d 1003, 1005 (1st Cir. 1992); *United States v. Field*, 39 F.3d 15, 17 (1st. Cir. 1994). Here, Mr. Ramirez does not contest the first and third elements.[27] Rather, the dispute is whether Mr. Ramirez "knowingly" possessed the firearm.

The Court readily concludes that the Government proved beyond a reasonable doubt that Mr. Ramirez knowingly possessed the firearm. Putting aside for the moment Mr. Ramirez's motivation for obtaining the firearm, it is apparent that he knew that the item he possessed while inside Frati's was a firearm. He arrived at Frati's via taxi, after asking the cabdriver to take him somewhere that sold firearms. He expressed his interest in obtaining a firearm to Mr. Frati, completed the requisite paperwork, spoke with Mr. Frati about what he was looking for in a firearm, handled two different firearms while inside the store, and expressed his preference for the smaller of the two. Mr. Ramirez testified that his purpose in filling out Form 4473 was "to get a gun. . . . That's what I was trying to do," *Tr. II* at 167:22-23, and that his purpose in looking at the firearm was "to buy it, you know." *Tr. II* at 168:14-15. Finally, Dr. Martinez's initial assessment of Mr. Ramirez's conduct was:

> Mr. [Ramirez] had the forethought to falsely answer questions regarding his criminal status and citizenship, which, had he answered truthfully, would likely have precluded him from obtaining the firearm. He had the temporal cognition at the time, regardless of the situation or environment to understand the cause and effect of his actions. His behavior was goal directed, coherent and organized with the intention of possessing a firearm. Mr. [Ramirez]'s actions at the pawnshop and at the time of his arrest demonstrate that he had taken prior actions (telling the taxi to wait for him), understood that what

---

[27] *See* Gov't Exs. 8-11 (judgments of Mr. Ramirez's previous felony convictions); testimony of Brent McSweyn, ATF special agent, January 5, 2007.

> he was doing was wrong (telling the pawnshop owner that he
> wanted a gun that could be concealed from the police, false
> statements on the ATF form, putting a firearm in his waistband
> and covering the firearm) . . . .

Def. Ex. 2 at 28.  Because the Court finds that Mr. Ramirez knowingly possessed a firearm

while in Frati's and has met the other two elements of the crime, it concludes that the

Government has met its burden of proof on Count I of the Indictment.

### 2.  Count Two: Violation of 18 U.S.C. § 922(a)(6) – False Statements

To demonstrate a violation of 18 U.S.C. § 922(a)(6), false statements in connection

with the acquisition of a firearm, the Government must prove: (1) that Mr. Ramirez

knowingly made a false statement; (2) that at the time he made the statement, Mr. Ramirez

was trying to buy a firearm from a licensed dealer; and (3) that the statement was intended to,

or likely to, deceive the licensed dealer about a fact material to the lawfulness of the sale.

*Jury Instructions* § 4.18.922(a).  The jury instructions state: "A false statement is made

'knowingly' if the person making it knows that it is false, or demonstrates a reckless

disregard for the truth and has a conscious purpose to avoid learning the truth . . . ." *Id*.  The

comments provide:

> [In this context] [t]he definition of "knowingly" is different
> from the customary definition of "knowingly"  . . . for other
> types of offenses.  It comes from United States v. Wright, 537
> F.2d 1144, 1145 (1st Cir. 1976), a case arising under 18 U.S.C.
> § 922(a)(6).  United States v. Santiago-Fraticelli, 730 F.2d 828,
> 831 (1st Cir. 1984), emphasized that section 922(a)(6)'s scope
> is "not limited to situations in which an accused knew he was
> lying."  "[W]hen a person recklessly fails to ascertain the
> meaning of the questions contained in Form 4473, and simply
> answers the questions without regard to whether the answers
> are truthful," he is acting "knowingly" for purposes of this
> section.

*Id*.

Mr. Ramirez made false statements on Form 4473. He stated that he had never been convicted of any felony when he has been convicted of at least six felonies; he stated that he was born in Miami, Florida when he was born in Havana, Cuba; and, he stated that he was a United States citizen when Mr. Ramirez has never been a United States citizen and has previously acknowledged that he is a Cuban citizen. Here, again, the issue concerns the *mens rea* and whether Mr. Ramirez knowingly made the false statements.

Defendant argues that there "is more than reasonable doubt" as to this charge because of Mr. Ramirez's obvious inability to understand Form 4473. Defendant says "Mr. [Ramirez] testified that he did not understand the Form and that Mr. Frati assisted him by telling him how to respond to the Form's questions," and Mr. Ramirez's "problem with the English-only form . . . made it impossible to fill out the Form without Mr. Frati's assistance." *Def.'s Br.* at 5-6.

The Court discounts this argument. First, numerous individuals suggested that Mr. Ramirez was capable of conversing in English. Many of his interviews were conducted in English and his responses were entirely appropriate and demonstrated comprehension; the exchange at Frati's was conducted in English and both Mr. Frati and the other patron inside Frati's reported that his English was easily understandable; he spoke to his cabdriver in English and effectively communicated to him where he wanted to go; one corrections officer at the Cumberland County jail reported to Dr. Martinez that Mr. Ramirez "speaks good English, but selectively. If he doesn't want to do something or is mad, he will pretend not to understand you or what you are asking him," Def. Ex. 2 at 13; and, finally, Dr. Scronce testified at length about Mr. Ramirez's manipulative behavior, including as one example the fact that he would provide "many other explanations about his offensive behavior that were

all things that would reduce his culpability, for instance, blaming the pawn shop owner and saying that he couldn't read English and he didn't know what he was filing out." *Tr. IV* at 154:23-25, 155:1-3. Moreover, Mr. Ramirez has appeared before the Court on a number of occasions and it is the Court's impression that he has a basic level of English competence consistent with his presence in the United States for the past twenty-seven years, though he is more conversant and comfortable in his native Spanish.

Second, since Mr. Ramirez's answers on Form 4473 correspond to the questions, this further suggests comprehension. For example, Question 2 asked for "Residence Address," and Mr. Ramirez wrote "407 Cumberland Ave Bangor, Penobscot, ME." Gov't Ex. 3. Question 3 asked for "Place of Birth," and Mr. Ramirez wrote "Miami, FL." *Id*. Question 9 asked "What is your State of residence," and Mr. Ramirez wrote "Maine." *Id*. Question 10 asked "What is your country of citizenship?" and Mr. Ramirez ultimately provided the United States.

Third, closely related to the second issue, there is a dispute about the amount of assistance Mr. Frati provided Mr. Ramirez. The Government maintains that Mr. Frati only helped Mr. Ramirez spell "Penobscot" and that he pointed out to Mr. Ramirez that he had neglected to answer Question 10. By contrast, Mr. Ramirez maintains that Mr. Frati helped him with almost every question on the form. The Court does not credit Mr. Ramirez's testimony on this issue. As a threshold matter, Mr. Ramirez's ability to recollect or precisely explain much of the exchange at Frati's is poor and he repeatedly testified to vague memory problems. Also, although it is theoretically possible that Mr. Frati could have given Mr. Ramirez some answers, Form 4473 contains the same street address – 407 Cumberland Ave. (albeit in Bangor, not Portland) – that is found in the Request for Release from Detention

dated January 28, 2005 and the Application for Employment Authorization dated March 2, 2005.  Gov't Exs. 17-A, 17-C.  Mr. Ramirez's street address must have come from Mr. Ramirez, not Mr. Frati.

The Court concludes that the Government has proven beyond a reasonable doubt:  (1) that Mr. Ramirez knowingly made false statements on Form 4473; (2) that he was trying to buy a firearm from Frati's when he made those statements;[28] and, (3) that the statement was likely to deceive Mr. Frati about a fact material to the lawfulness of the sale.[29]   The Court concludes that the Government has met its burden of proof on Count II of the Indictment.

### 3.  Count Three: Violation of 18 U.S.C. § 911 – False Impersonation

To demonstrate a violation of 18 U.S.C. § 911, false impersonation of a citizen of the United States, the Government must prove: (1) that Mr. Ramirez falsely represented himself to be a citizen of the United States; (2) that Mr. Ramirez was not a citizen of the United States at that time; and (3) that Mr. Ramirez made such false representation willfully, that is, the misrepresentation was voluntarily and deliberately made.  *Ninth Circuit Model Criminal Jury Instructions* § 8.41 *available at* http://www.ca9.uscourts.gov.

To act "willfully" means to act "voluntarily and purposefully with the specific intent to do something the law forbids."  *United States v. Yefsky*, 994 F.2d 885, 899 (1st Cir. 1993)."   As the First Circuit has written, the "hornbook definition" of "willfully" is: "Participation in a crime is willful if done voluntarily and intentionally, and with the specific intent to do something which the law forbids or with the specific intent to fail to do

---

[28] Mr. Ramirez testified that his purpose in looking at the firearm was "to buy it, you know."  *Tr. II* at 168:14-15.

[29] Mr. Frati testified that if a person "answered yes to the question if they were a felon, the transaction would stop. And I would tell them that they're not supposed to acquire or possess a firearm," *Tr. II* at 16:4-7.  Further, Dr. Martinez's report reads: "Mr. [Ramirez] had the forethought to falsely answer questions regarding his criminal status and citizenship, which, had he answered truthfully, would likely have precluded him from obtaining the firearm."  Def. Ex. 2 at 28.

something the law requires to be done; that is to say, with a bad purpose either to disobey or
to disregard the law." *Bailey*, 405 F.3d at 110 n.4 (emphasis omitted). In other words, "to
establish a 'willful' violation of a statute, 'the Government must prove that the defendant
acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. at
191-92 (citation omitted).

The evidence unambiguously revealed that, although Mr. Ramirez wrote that he was a
United States citizen on Form 4473, Mr. Ramirez has never been a United States citizen.
Again, the issue is *mens rea*. Defendant argues there is more than reasonable doubt as to
whether Mr. Ramirez intended to violate the law. Defendant points out the testimony offered
by Mr. Ramirez concerning his citizenship status. He said: "I was a citizen of Cuba. I don't
know now if I am. I'm still a citizen of Cuba because I'm not there. . . . Now I don't know
what country is my country of citizenship. I don't know." *Tr. II* at 122:23-25, 123:1-4.
Defendant further urges:

> The very nature of Mr. [Ramirez]'s response to Question 10
> indicates that he did not understand it sufficiently to intend to
> commit the alleged misrepresentation. At first, Mr. [Ramirez]
> left Question 10 blank. Mr. Frati told Mr. [Ramirez], "[Y]ou
> forgot this one here." This omission suggests that Mr.
> [Ramirez] did not understand Question 10. The first part of
> Mr. [Ramirez]'s two word answer to Question 10, "Yes," is
> non-responsive and illogical as to the question, "What is your
> country of citizenship." The non-responsive, "Yes," clearly
> establishes reasonable doubt that Mr. [Ramirez] understood
> Question 10 well enough to answer with the "bad purpose"
> necessary for a § 911 conviction.

*Def.'s Br*. at 8-9.

The Court cannot agree. Mr. Ramirez testified more than once that he is Cuban. The
evidence revealed that Mr. Ramirez documented his country of citizenship as "Cuba" in two
federal forms he completed within months of April 13, 2005. Gov't Exs. 17-A, 17-C. Mr.

Ramirez's alien registration card further indicates that he is a citizen of Cuba. Gov't Ex. 14. ICE Agent Glidden personally instructed Mr. Ramirez to carry this card with him at all times, and Mr. Ramirez had it with him in Bangor. Mr. Ramirez also had his employment authorization card, which reads across the top "Department of Justice Immigration and Naturalization Service." Gov't Ex. 15. In short, Mr. Ramirez knew that he was Cuban and he knew that he was not a United States citizen. He had been ordered deported, had remained in the United States on an order of supervision, and had been required to meet with ICE officials concerning his alien status.

In the Court's view, Mr. Ramirez's initial reluctance to answer Question 10, asking for his country of citizenship, does not show confusion. Nor does Mr. Ramirez's presentation of a Social Security card, as opposed to his alien registration card or his employment authorization card – as the requisite photo identification – suggest confusion. Nor does his subsequent denial of having a Social Security card while being apprehended by the police suggest confusion. The Court agrees with the Government that all of these actions evince "consciousness of guilt." *Gov't Br.* at 11. Once again, Dr. Martinez initially concluded that "Mr. [Ramirez] had the forethought to falsely answer questions regarding his criminal status and citizenship, which, had he answered truthfully, would likely have precluded him from obtaining the firearm." Def. Ex. 2 at 28.

As the Court earlier concluded, § 911 is a specific intent crime. As such, the Court has considered psychological evidence in evaluating whether the Government sustained its burden of proof beyond a reasonable doubt on the requisite level of *mens rea*. Still, the Court finds that it is beyond any reasonable doubt that Mr. Ramirez knew that he was not a United States citizen, that he was not telling the truth when he represented that he was a United

States citizen on Form 4473, and that he made the misrepresentation willfully for the bad purpose of obtaining a firearm that he knew he would otherwise not be allowed to purchase.

Defendant next argues that Mr. Ramirez's intoxication negates the requisite intent. "Voluntary intoxication may rebut proof of intent in a specific intent but not a general intent crime." *Jury Instructions* § 5.03 (citation marks omitted). He argues:

> In the 24 hour period prior to the incident at Frati's pawn shop, Mr. [Ramirez] had consumed a six pack of beer, some hard liquor, and pills. Mr. [Ramirez] testified that he was unsure whether he was drunk or not. Nevertheless, the amount of intoxicants consumed by Mr. [Ramirez] creates reasonable doubt as to whether he possessed the required intent for [Count] III.

*Def.'s Br.* at 10-11.

The Court is not persuaded that Mr. Ramirez was intoxicated when he went into Frati's and, therefore, unable to formulate the requisite intent. The only evidence that Mr. Ramirez was intoxicated at the time comes from Mr. Ramirez himself, and his recollection is extremely vague. He said he had:

> some beer, and I had a six pack, and I don't really remember. But when the police arrested me, they found three empty cans of beer. I drank three of them in a glass with ice, those last three. I don't remember. I could have drank – let me think. Let me see if I remember. I began drinking in Portland before coming up here to Bangor. I had some hard liquor, beer also and pills. Here I – I drank also. I can't remember exactly how much it was. It could have been a six pack. It could have been two.

*Tr. III* at 18:25-25, 19:1-8.

Although an inability to recall could be consistent with intoxication, there is no corroborating evidence; the evidence, including the testimony of contemporaneous witnesses, is to the contrary. The video taken at Frati's shows Mr. Ramirez's actions while in the store

and there is nothing to suggest he was intoxicated.  Mr. Frati testified that Mr. Ramirez did not appear intoxicated; he smelled "no liquor on him and he was very coherent and very friendly in his speech." *Tr. II* at 43:10-13.   Mr. Frati also allowed him to handle both firearms, which he would not have done, if he had been "intoxicated or acting very unusual."[30] *Tr. II* at 43:6-9.

The Court finds that Mr. Ramirez was not intoxicated when he was at Frati's pawn shop.  Mr. Ramirez's hazy recollection is contradicted by other convincing evidence, including the videotape evidence and Mr. Frati's actions in allowing him to apply to purchase a firearm and to handle the firearms, something that would be manifestly unreasonable if Mr. Ramirez had been intoxicated.

Therefore, the Court finds that Mr. Ramirez did willfully, that is, voluntarily and deliberately, falsely represent himself to be a United States citizen when he knew he was not.  The Court concludes that the Government has met its burden of proof on Count III of the Indictment.

### C.  The Insanity Defense

Having concluded that the Government has met its burden of proof on all Counts of the Indictment, the Court turns to Mr. Ramirez's claim of insanity.  The IDRA provides:

> (a) Affirmative defense. It is an affirmative defense to a prosecution under any Federal statute that, at the time of the

---

[30] Two other witnesses saw Mr. Ramirez around the time of the incident.  Dale Robertson, a customer who was present at Frati's when Mr. Ramirez was there, testified that he overheard Mr. Ramirez say in English that he wanted to be able to hide a weapon, so that the man would not know he had it on him, and so that he could get the man before the man got him. *Tr. II* at 57:12-15.  Mr. Robertson had no trouble understanding Mr. Ramirez, *id.* at 57:19-21, and made no reference to any concerns about his intoxication.  John Richardson was the cabdriver who took Mr. Ramirez to Frati's and he testified that although Mr. Ramirez spoke "broken English," he had "very little" difficulty understanding him. *Tr. II* at 61:13-18.  He drove Mr. Ramirez to Frati's so that he could shop for a firearm and stayed outside to complete the ride as Mr. Ramirez went inside the pawn shop. *Tr. II* at 61:8-10; 62:13-22.  During his testimony, he was not asked about and did not mention intoxication, but it would be risky to transport an intoxicated man seeking to purchase a firearm to a firearms dealer and then wait outside while he tried to complete the transaction.

> commission of the acts constituting the offense, the defendant,
> as a result of a severe mental disease or defect, was unable to
> appreciate the nature and quality or the wrongfulness of his
> acts. Mental disease or defect does not otherwise constitute a
> defense.
> (b) Burden of proof. The defendant has the burden of proving
> the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17; s*ee also Clark v. Arizona*, 126 S. Ct. 2709 (2006); *Schneider*, 111 F.3d at

197; *United States v. Allen*, 449 F.3d 1121, 1125 (10th Cir. 2006) ("[I]nsanity is, as the

statute expressly says, an affirmative defense.   The fundamental concept of an affirmative

defense is that it does not negate an element of the adversary's case.").   To be successful, a

defendant must satisfy the statute's two-pronged test:   "First, he must establish that he

suffered from a serious mental disease or defect at the time of the crime.   Second, his mental

disease or defect must have prevented him from appreciating the nature and quality or

wrongfulness of his acts."   *United States v. Knott*, 894 F.2d 1119, 1121 (9th Cir. 1990).

Federal Rule of Evidence 704(b) prohibits an expert from offering an opinion on a

defendant's ability to appreciate the nature and quality or wrongfulness of his acts:

> No expert witness testifying with respect to the mental state or
> condition of a defendant in a criminal case may state an
> opinion or inference as to whether the defendant did or did not
> have the mental state or condition constituting an element of
> the crime charged or of a defense thereto. Such ultimate issues
> are matters for the trier of fact alone.

Fed. R. Evid. 704(b).   An expert may testify, however, as to whether a defendant was

suffering from a severe mental disease or defect at the time of the offense and the

characteristics of that diagnosis.   This Court has previously explained the relationship

between the Federal Rules of Evidence and the insanity defense:

> To be sure, [the doctor] may not testify on whether [the
> defendant] could appreciate the nature and quality or
> wrongfulness of his acts, but that does not prevent [the

defendant] from testifying.  [The Defendant] may take the stand and testify that at the time he did not in fact understand the nature and quality or wrongfulness of what he was doing. The jury may disbelieve or believe that testimony.  [The doctor] could also be asked, after hearing [the defendant's] testimony, whether what [the defendant] described could, if believed, be explainable by the psychosis.  If [the doctor] then testified that it could not be caused by the psychosis (and no other doctor testified to the contrary) I would exclude the insanity defense because it was not medically supportable. [The doctor] would still not have testified as to whether [the defendant] at the time did or did not appreciate the nature and quality or wrongfulness of his acts.  If, on the other hand, [the doctor] testified that it could be caused by the psychosis, the insanity defense would go to the jury.  This outcome seems consistent with Congress's goal in preventing expert testimony on the ultimate issue – i.e., to preserve the jury's common sense role.  This procedure lets the experts testify about what is a mental disease or defect and what is severe, matters not within the experience of ordinary jurors and thus deserving expert opinion.  It prevents the experts from testifying about the ultimate issue the jury must decide – did this defendant in fact appreciate the nature and quality or wrongfulness of his acts at the time in question? – and lets the jury use its collective common sense and wisdom on this issue.  Finally it allows expert testimony on the "causation" factor, i.e. whether the mental state as the defendant describes it, if believed, can scientifically be attributed to the severe mental disease or defect.

*United States v. Meader*, 914 F. Supp. 656, 659 (D. Me. 1996).

Mr. Ramirez's insanity defense suffers from myriad problems.  First, the Court, as the trier of fact, simply cannot credit Mr. Ramirez's testimony that he did not understand what he was doing at Frati's.  His repeated protestations that he was not in his right mind do not comport with calculating and controlled behavior.  This is particularly true in light of the fact that both Dr. Martinez and Dr. Scronce agreed that Mr. Ramirez can be highly manipulative. Dr. Martinez stated that Mr. Ramirez's performance on various tests administered suggested "a clear attempt on his part to portray himself as experiencing memory impairments that do

not actually exist." Def. Ex. 2 at 17. Dr. Scronce testified at length about Mr. Ramirez's manipulative behavior, including one instance in which he told Dr. Scronce "that [she] should write in the report that he was incoherent, that he was intoxicated . . . ." *Tr. IV* at 153:14-16.

Second, there is a patent disparity between the expert opinions. Dr. Martinez testified that his primary diagnosis here would be schizophrenia, as characterized by "disorganized thinking, a break with reality, a quick decompensation of cognitive function and mental status changes . . . visual hallucinations . . . delusions . . . disruptive behaviors, disorganized thinking, tangential, circumstantial, lucid ideas, flightive ideas and so on." *Tr. IV* at 6:11-17. According to Dr. Martinez, the "alcohol dependence, alcohol-induced psychosis is a secondary diagnosis, which contributes heavily to the symptom manifestation of hallucinations and some of the things that Mr. [Ramirez] indicated he experienced resulting from consumption of alcohol." *Tr. IV* at 4:23-25, 5-1-4. Conversely, Dr. Scronce concluded that Mr. Ramirez does not suffer from any severe mental disease or defect and that he did not suffer from any severe mental disease or defect at the time of the offense.

Here, the Court is not simply left with determining which expert to credit. The first problem is the marked discrepancy between Dr. Martinez's own first and second opinions. In his February report, Dr. Martinez concluded:

> It is the opinion of this examiner, based on reasonable scientific certainty that the defendant was not suffering from an active phase of a severe mental illness or defect at time of the alleged offense. . . . There is no evidence, in my opinion, that his offense was in any way a product of active mental illness or mental defect.

Def. Ex. 2 at 28. He repeatedly stated the conclusion that Mr. Ramirez was exaggerating and/or fabricating psychotic-spectrum symptoms. He included the information he received

from a number of secondary interviews, all of which describe Mr. Ramirez as frequently malingering and manipulating.  His report stated that the "police interviews indicate that all the witnesses at the time of the offense did not perceive Mr. [Ramirez]'s thinking or behavior as scrambled or disorganized," Def. Ex. 2 at 28, behavior he testified as being symptomatic of schizophrenia.  Finally, his February report stated that Mr. Ramirez's "actions indicate a significant degree of . . . planned, controlled behavior . . . ."  *Id.*

Dr. Martinez's August opinions are simply irreconcilable with his February opinions.[31]  Notwithstanding Dr. Martinez's emphasis on the fact that he considered the second evaluation an entirely separate evaluation, the Court is troubled.  Specifically, his selective omission of germane information – namely Mr. Ramirez's proclivity towards malingering[32] and a number of secondary interviews corroborating as much – while retaining other information obtained from Mr. Ramirez himself, his admission that he understood that his February report would be shared only with the defense while the August report would be shared with the Government, his limited experience with alcohol-induced psychosis, and his inclusion of full sentences from other sources without citation is all disturbing.  In sum, the Court finds that Dr. Martinez's opinions cross the line between expert analysis and advocacy and it, therefore, finds his later-formulated views of limited usefulness in assessing Mr. Ramirez's insanity defense.

Third, there is a tension between insanity and intoxication.  To be clear, on this point, Mr. Ramirez is not claiming that his intoxication at the time of the incident supports his

---

[31] It is also troubling that defense counsel failed to reveal the existence of the February report until mid-trial. *Tr. III* at 4:1-10:8.  Nevertheless, the Court (and the Government) accepted defense counsel's representation that the omission was unintentional.  The Court has not considered this discovery violation in assessing Dr. Martinez's credibility.

[32] Both experts explained that malingering does not necessarily mean that an individual does not suffer from a mental disease or defect.

insanity defense.  To do so would violate congressional intent under the IDRA.  *See Knott*, 894 F.2d at 1121-22 ("the voluntary use of alcohol or drugs, even if they render the defendant unable to appreciate the nature and quality of his acts, does not constitute insanity."); *United States v. Garcia*, 94 F.3d 57, 61-62 (2d Cir. 1996); *United States v. Ramirez*, No. 05-71-B-W, 2007 U.S. Dist. LEXIS 1543 (D. Me. Jan. 8, 2007).  In any event, the Court has already concluded that Mr. Ramirez was not intoxicated when the incident occurred and, therefore, the only relevance his past abuse of alcohol presents is its relationship, if any, to an underlying psychological condition, such as Alcohol-Induced Psychotic Disorder with Hallucinations.  *Ramirez,* 2007 U.S. Dist. LEXIS 1543, at *11 (noting that the Defendant's "ingestion of alcohol may be integral to the underlying mental disease or defect.").  Having heard the evidence, however, the Court does not need to thread this particular needle, since it has found Dr. Martinez's testimony unconvincing and rejects his conclusion that Mr. Ramirez has "underlying schizophrenic symptoms . . . exacerbated by his alcohol abuse . . . ."  Def. Ex. 3 at 12.

Instead, the Court accepts the testimony of Dr. Scronce.  It finds that Mr. Ramirez was not suffering from an underlying mental disease or defect on April 13, 2005; instead, the Court finds that Mr. Ramirez is highly manipulative and his psychiatric presentation is consistent with malingering.  The Court makes this finding not to disparage Mr. Ramirez.  To the contrary, it remains sympathetic to him and the hard life he has led, both before he left Cuba and since he came to the United States.  But, the Court is convinced that Mr. Ramirez is much brighter and much more in control than he is willing to let on.

The unfortunate truth is that to obtain essential services in the United States, it is often necessary to carry a medical diagnosis.  As Mr. Ramirez himself commented to the

personnel at Grady, "[I am] going to tell [my] other homeless friends that they should report that they're suicidal or homicidal so they can come to the hospital because you get a bed and food and it's much better than being in jail." *Tr. IV* at 159:1-8. Mr. Ramirez has realized since he committed these offenses that exactly the same calculus applies to this case: if deemed insane, he will go to the hospital and, if convicted, he will go to jail. Far from being a reflection of underlying psychosis, his preference to go to a psychiatric ward, not a cell block is eminently rational. What is admittedly unusual is the length to which Mr. Ramirez is willing to go to demonstrate that he is irrational, but this is learned behavior, which has proven effective and has been rewarded in the past. His ability and willingness to act out to obtain his wishes does not mean that he is insane nor does it mean that he was insane on April 13, 2005, when he went to buy a gun at Frati's in Bangor, Maine. The Court finds that he knew what he was doing then, just as he knows what he is doing now.[33]

## III. CONCLUSION

The Court finds Cosme Sanchez Ramirez GUILTY, as charged, of Counts I, II and III of the Indictment.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of July, 2007

---

[33] Mr. Ramirez first filed a Motion for Mental Examination, Report and Hearing to Determine Competency on April 19, 2005 (Docket # 13); the Court granted the motion on April 22, 2007 (Docket # 14). On June 5, 2006, Mr. Ramirez filed a Second Motion for Mental Examination, Report and Hearing to Determine Competency (Docket # 113); the Court dismissed the motion without prejudice, as premature (Docket # 120). On June 8, 2007 – well after the trial had been completed – Mr. Ramirez filed a Third Motion for Mental Examination, Report and Hearing to Determine Competency (Docket # 193). On June 12, 2007, Mr. Ramirez filed an Addendum to the Third Motion (Docket # 196). Based on its verdict and the reasons underlying the verdict, the Court DENIES the Defendant's Third Motion for Mental Examination.